UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| **DOMACH REATH**, | CIV. 09-4131 |
| Plaintiff, | |
| vs. | **REPORT and RECOMMENDATION** |
| | (Motion for Summary Judgment, Doc. 30) |
| **DOUGLAS WEBER**, Warden; and **AL MADSEN**, D-Unit Manager; both sued in individual and official capacities, | |
| Defendants. | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending is Defendants' Motion for Summary Judgment (Doc. 30). Also pending is Plaintiff's Motion for Appointment of Counsel (Doc. 15). For the reasons more fully explained below, Plaintiff's Motion for Appointment of Counsel is **DENIED** and it is respectfully recommended to the District Court that Defendants' Motion for Summary Judgment be **GRANTED**.

## INTRODUCTION

Plaintiff filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983 in August, 2009. In his Complaint, Plaintiff asserted that in May, 2009, he was placed in a cell with another inmate who had active tuberculosis. Plaintiff asserted the "SDSP administration" was aware the other inmate had active tuberculosis but failed to inform Plaintiff. Plaintiff claimed that as a consequence, he "contracted an incurable disease that threatens [his] health and life." Plaintiff asserted the Defendants actions rose to the level of deliberate indifference to his health and welfare.

In the "relief" section of his Complaint, Plaintiff requested actual damages in the form of payment of his medical bills, punitive damages in the amount of five million dollars, and injunctive relief in the form of an order by this Court directing the Defendants to implement and follow policies to control exposure to communicable disease in their institutions. He also requested a TRO directing Defendant Al Madsen to refrain from retaliation because Plaintiff "feared for his life."

1

## PROCEDURAL HISTORY

The Defendants were served suit papers in September, 2009 and filed their Answer in October, 2009. A scheduling order was issued in November, 2009. Attached to the Court's Scheduling Order were copies of the Local Rules of Practice and Federal Rules of Civil Procedure 26, 33, 34, 36, 37, and 56. Defendants filed a Motion for Summary Judgment on April 22, 2010. In support of the motion, Defendants filed a Supporting Memorandum (Doc. 31), a Statement of Undisputed Facts (Doc. 32), the Affidavit of Douglas Weber (Doc. 33), the Affidavit of Al Madsen (Doc. 34), the Affidavit of Clifton Fantroy (Doc. 35) and the Affidavit of Dr. Eugene Regier (Doc. 36). Plaintiff filed nothing in response to the motion except a letter dated May 6, 2010 which does not address the issues raised in his Complaint or the summary judgment motion.[1] *See* Doc. 37. This matter is therefore ripe for decision.

## UNDISPUTED FACTS

"A Plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment, and complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint." *Roberson v. Hayti Police Department*, 241 F.3d 992, 994-95 (8th Cir. 2001). However, if the allegations in the verified complaint consist of nothing more than conclusory allegations, they are insufficient to overcome a summary judgment motion. *Roberson v. Bradshaw,* 198 F.3d 645, 647 (8th Cir. 1999). Plaintiffs' Verified Complaint alleges the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment because they were deliberately indifferent to a serious medical need. Specifically, he asserts they knowingly placed him in the same cell with another inmate who was ill with an active case of tuberculosis, and as a

---

[1] The letter begins "To whom it may concern, these devils just committed another hate crime, rape another from the series. Tim Reisch and Douglas Weber are taking and giving out orders. I don't know who else is involve that out rank them, but my guest (sic) is the states atterney (sic) possibly the governor. . . .These terrorist faggots druged (sic) my food on April 30th 2010, they came into my cell while the the drug was in effect the whole weekend I felt weird." The tone of the remainder of the letter is similar. It concludes by stating "They're hateful Nazi they have no respect for human life."

The Court received one other letter from Plaintiff dated September 30, 2009. It also contains claims that Plaintiff was raped and that prison officials orchestrated the attack. The Court has reviewed the medical records which are attached to the Affidavit of Dr. Eugene Regier. (Doc. 36). There is at least one mention of an alleged sexual assault in Dr. Regier's notes, but Dr. Regier's physical exam did not reveal any evidence to confirm sexual assault. In any event, Plaintiff's Complaint alleged deliberate indifference to a serious medical need (exposure to tuberculosis) and Plaintiff has not amended it to include his claims of sexual assault or involuntary drugging by "terrorist faggots" or "hateful Nazis."

result Plaintiff became ill with "an incurable disease." To prevail, however, Plaintiff must provide through discovery, affidavits, and/or depositions more than conclusory assertions.

In this case, some of the Defendants' undisputed facts contradict the conclusory allegations contained in Plaintiff's verified Complaints. These contradictions do not necessitate the denial of Defendants' motion. The Local Rules of Practice for the United States District Court, District of South Dakota require the party opposing a summary judgment motion to respond to the moving party's statement of undisputed material facts, and provides "all material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *See* Local Rule 56.1(B),(C)) & (D). "Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984). Additionally, a district court has no obligation to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser Busch, Inc.,* 87 F.3d 256, 260 (8th Cir. 1996). Nor is the court "required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Id.* Because he did not respond to Defendants' Statement of Undisputed Facts, therefore, Plaintiff has admitted them.

The Court could grant summary judgment without further analysis because a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That said, and out of an abundance of caution, the merits of this case will be briefly examined. The undisputed facts as presented by the Defendants are as follows:

Plaintiff Domach Reath (Reath) is in the custody of the South Dakota Department of Corrections (DOC) and is currently incarcerated at the South Dakota State Penitentiary in Sioux Falls, South Dakota (SDSP) (Doc 1). Defendant Douglas Weber (Weber) is employed by the DOC as warden of the SDSP. *Id.* Defendant Al Madsen (Madsen) is employed by the DOC as a unit manager at the SDSP. *Id.* Reath filed this action against Weber and Madsen in both their individual and official capacities. Doc.1.

Reath alleges the Defendants were deliberately indifferent and violated the Eighth Amendment provision against cruel and unusual punishment when they placed Reath in the same cell as an inmate who will be referred to by his initials (KI).[2] Reath alleges KI had tuberculosis (TB) at the time he shared a cell with him and that, as a result of his cell assignment, Reath contracted TB. Doc. 1.

TB is a contagious disease that can affect almost any part of the body but is mainly an infection of the lungs. Regier Aff., ¶ 4. TB exists in latent and active stages. Persons with latent TB are infected with the bacterium that causes TB, but are not contagious. An inmate with latent TB cannot spread TB to another inmate. Regier Aff., ¶ 4. Persons with active TB, by contrast, exhibit symptoms, including persistent coughing, bloody sputum, night sweats, unexplained weight loss, anorexia, and/or fever, and are contagious. An inmate with active TB can spread the disease to other inmates. Regier Aff., ¶ 4. In order to prevent the spread of TB at the SDSP, mandatory TB skin testing is performed on all inmates upon admission. *Id.*, ¶ 5. If a prisoner has a positive skin test result, a chest x-ray is performed to evaluate whether the prisoner has latent or active TB. Tests of the inmate's blood and sputum may also be performed to determine whether the inmate has developed active TB. *Id.* If the chest x-ray shows signs of active TB, or medical providers otherwise suspect active TB based on the inmate's symptoms, the inmate is immediately isolated and transferred to a hospital until the prisoner is determined to be non-infectious. *Id.* If an inmate has only latent TB, prison medical providers monitor the inmate for signs and symptoms of active TB and perform routine chest x-rays to ensure that the inmate has not developed active TB. An inmate who has latent TB is also given a course of treatment, generally termed INH therapy, which will greatly reduce the risk that he will develop active TB in the future. *Id*, ¶ 6. There is no danger or threat of exposure of TB by having inmates with latent TB share cells with inmates who do not have TB. Only inmates with active TB need to be isolated and removed from the prison. *Id.*, ¶ 11.

On May 22, 2009, Reath was housed in the North wing at the SDSP, cell N128. On that date, Reath was written up for fighting with another inmate. Based on Reath's prohibited conduct, the unit disciplinary committee sanctioned Reath by imposing twenty days in disciplinary segregation to

---

[2]Plaintiff's cellmate is not a party to this lawsuit and has not made his own health status an issue in this case. Defendants have submitted the Affidavit of Dr. Eugene Regier and attached KI's medical records. Although KI's medical condition is relevant as it pertains to Plaintiff's claims, there has been no showing KI has waived the confidentiality of his medical records pursuant to SDCL 19-13-11. The Court has ordered Dr. Regier's affidavit to be sealed to protect KI's privacy.

begin on May 29, 2009. Fantroy Aff., ¶ 3, Ex. A1-7. Based on the unit disciplinary committee's decision, and the fact that Reath had a fight with another inmate, the SDSP staff decided to place Reath in Unit D at the SDSP, where he could be more closely supervised. *Id*., Ex. A6-7. The SDSP has limited written policies regarding cell assignments. Cell assignments are made at the discretion of the unit manager. There is no policy prohibiting an inmate with latent TB from being housed with inmates who do not have latent TB. *Id*., ¶ 4, Ex. B. Reath's placement and transfer forms show that, on May 29, 2009, Reath was placed in Unit D, cell D-79. According to KI's transfer form, he too was housed in Unit D, cell D-79 on that date. Fantroy Aff., ¶ 3, Ex. A1; ¶ 5, Ex. C. As shown on Reath's placement form, Defendant Madsen was not involved in Reath's cell assignment with KI on May 29, 2009. *Id*., ¶ 3, Ex. A1. Madsen is a unit manager at the SDSP. Unit managers routinely rotate to different units within the SDSP. Unit managers at the SDSP rotated on May 31, 2009, after Reath had been celled with KI on May 29, 2009. Madsen's first day on Unit D, where Reath and KI were celled together, was on June 1, 2009. Madsen Aff., ¶¶ 3-4. Shortly after Madsen began working on Unit D, on June 8, 2009, he transferred Reath out of D-79 and into cell D-84. Reath shared a cell with KI for approximately ten days. Madsen Aff., ¶ 5. Warden Weber is not responsible for making housing assignments and does not have any involvement in the process other than signing the placement forms in a supervisory capacity. Weber Aff., ¶ 8.

KI has been in and out of prison since 1995. He had already contracted TB before entering prison and was therefore classified as having latent TB at the time of his admission. Regier Aff., ¶ 3, Ex. B1. Because KI had a positive rest result for TB, he is seen regularly to monitor his latent TB. KI also treated his latent TB with INH therapy from June 17, 2003 until March 18, 2004 to reduce the chances of him developing active TB. *Id*., Ex. B2. KI did not have active TB and was not treating his latent TB at the time he shared a cell with Reath from May 29, 2009 through June 8, 2009. Although KI had latent TB at the time of his cell assignment with Reath, he was not contagious. *Id*.,Ex. B7-8; B15-47. KI was released on parole on June 15, 2009. His discharge summary provides that KI had a positive skin test on July 5, 1995 with a reaction of 23 mm and completed INH treatment in 2003. When he was released, KI was instructed to monitor for signs and symptoms of active TB. *Id*., Ex. B11. If KI had developed active TB during his cell assignment with Reath, treatment would have been necessary before active TB would be eliminated. KI's medical records do not show that he has received any treatment for active TB during his incarceration. *Id*., ¶ 10.

Reath was admitted to the SDSP on August 11, 2008. Upon admission, SDSP medical providers tested Reath for TB. Reath's test results showed no indication of TB. Regier Aff., ¶ 3, Ex. A1-2. SDSP medical providers tested Reath for TB again on June 1, 2009, two days after he began sharing a cell with KI. The test results returned positive for TB. *Id.* SDSP physician, Dr. Regier, ordered a chest x-ray on June 3, 2009, based on the positive acute TB skin test. The x-ray did not show signs of active TB. *Id.*, Ex.A4-5. Reath also had a CT of his chest performed on June 12, 2009. Dr. Brad Paulson reviewed the CT results and determined the results showed possible TB based on a small cluster of nodular densities on Reath's left upper lobe. *Id.*, Ex. A8. On June 17, 2009, Dr. Regier conferred with Dr. Nazir at McKennan Hospital regarding Reath's CT results and decided, as a precaution, to admit Reath to McKennan Hospital for further testing to rule out active TB. Reath was admitted to McKennan Hospital the same day. *Id.*, Ex. A10-13. Upon admission at McKennan Hospital, Dr. Jawad Nazir examined Reath. Dr. Nazir noted no signs or symptoms to suggest active TB, but latent tuberculosis was possible. Dr. Nazir ordered a diagnostic work-up to rule out the possibility of active tuberculosis. *Id.* Additional lab tests were performed at McKennan Hospital, including sputum cultures, all of which returned negative for active TB. *Id.*, Ex. A15-23. Dr. Brian T. Hurley examined Reath at McKennan Hospital on June 19, 2009. Dr. Hurley referred to the SDSP's positive skin test result and CT test that suggested latent TB, but noted the test results performed at McKennan Hospital for active TB were negative. Dr. Hurley ordered INH therapy treatment for Reath's latent TB. *Id.*,Ex. A11-16.

Reath was discharged from McKennan on June 22, 2009. *Id.* On June 24, 2009, Reath complained of generalized chest pain. Nursing staff scheduled an appointment with the SDSP physician's assistant. *Id.*, Ex. A25. Physician's Assistant Jess Oakley examined Reath on June 25, 2009, for complaints of recurrent chest pain. Oakley noted that Reath had been exposed to an inmate who had a past positive TB reaction, but that testing of that inmate indicated that the inmate was non-infective. Oakley indicated that Reath was getting follow-up for his chest x-ray and was being treated with INH due to his TB exposure. *Id.*, Ex. A26. Dr. Nazir conducted a follow-up examination of Reath on July 20, 2009, regarding latent tuberculosis. Dr. Nazir reviewed the results of Reath's additional tests, which were negative. Dr. Nazir noted that all of Reath's sputum cultures had been negative for active TB to date. Dr. Nazir ordered that Reath complete the nine months of INH treatment for latent TB. *Id.*, Ex. A28. Reath stopped taking his INH therapy treatment in November of 2009. Both Dr. Nazir and Dr. Regier have told Reath that he is at increased risk of developing active TB if he does not take his medication, but he continues to refuse treatment. *Id.*, ¶13, Ex. A71-75. Currently, SDSP medical providers are monitoring Reath's condition for signs or

symptoms of active TB, including performing routine chest x-rays. Medical staff also continue to encourage Reath to take his INH medication. *Id*., ¶ 13. Reath tested positive for TB on June 1, 2009. Generally, after a person is infected, the TB incubation period preceding a positive skin test varies from two to twelve weeks. This indicates that Reath would have been infected with TB at least two to twelve weeks before June 1, 2009. Regier Aff., ¶ 8. Reath shared a cell with KI between May 29, 2009, and June 8, 2009. According to KI's medical records, KI did not have active TB and was not treating his latent TB at the time he shared a cell with Reath. *Id*., ¶9. According to Dr. Regier's medical opinion, Reath did not contract TB as a result of his cell assignment with KI from May 29, 2009 through June 8, 2009. KI did not have active TB at the time of his cell assignment and could not have spread the TB infection. Also, if Reath contracted TB from KI, he likely would not have had a positive TB skin test as early as June 1, 2009, which was only two days after he began sharing a cell with KI. *Id*., ¶

The administrative-remedy policy implemented by the DOC and followed by the SDSP requires that an inmate follow a two-step process to present complaints concerning the application of any administrative directive, policy, unit rule, or procedure. First, the inmate must file an informal resolution request. Second, if the issue is not resolved, the inmate must, within five days of the informal resolution request response, file a request for administrative remedy. Weber Aff., ¶ 5, Ex. A. Reath filed an informal resolution request on June 5, 2009, complaining of having a TB shot twice within a ninety day period. He complained of chest pain since having the shot. SDSP staff referred Reath to health services. Fantroy Aff., ¶ 3, Ex. A8-11. Reath filed another informal resolution request on June 29, 2009, complaining that he was celled with an inmate who had TB and had since been told by doctors at the hospital that he had TB. Reath did not request any relief. SDSP staff requested more specific information from Reath, including who Reath was celled with and what relief he was requesting. Fantroy Aff., ¶ 3, Ex. A15. Reath did not file any additional grievances after his June 29, 2009 complaint regarding his alleged contraction of TB. *See* gen. Fantroy Aff., ¶ 3, Ex. A. Reath filed one request for administrative remedy after the date he shared a cell with KI and before the filing of his complaint on August 31, 2009. The one request he filed, however, does not relate to his cell assignment. His request for administrative remedy dated June 12, 2009, pertains only to Reath's general dislike of Defendant Madsen, and Reath's request not to be housed in the same unit as Defendant Madsen. Weber Aff., ¶ 7, Ex. B. Warden Weber responded to Reath's request for administrative remedy dated June 12, 2009, by informing Reath that Madsen did not set him up in any way. Warden Weber also stated that since Reath had been assigned to live in Unit D and Madsen was the unit manager for Unit D, Reath would have to work with Madsen. *Id*. Other

than responding to Reath's requests for administrative remedy, Warden Weber did not have any direct contact with Reath about his cell assignment or his medical care. *Id.*, ¶ 18.

## ANALYSIS

**Plaintiff's Motions For Counsel**

Plaintiff filed two motions for legal assistance, requesting that the Court appoint someone trained in the law to represent him. (Docs. 15 and 27). "Indigent civil litigants do not have a constitutional or statutory right to appointed counsel." *Edgington v. Missouri Dep't of Corrections,* 52 F.3d 777, 780 (8th Cir. 1995). The factors relevant to evaluating a request for appointment of counsel include "whether both the plaintiff and the court will benefit from the appointment of counsel, taking into account the factual and legal complexity of the case, the presence or absence of conflicting testimony, and the plaintiff's ability to investigate the facts and present his claim.*" Davis v. Scott,* 94 F.3d 444, 447 (8th Cir. 1996).

This case is not factually complex. Like all individuals untrained in the law, plaintiff may benefit from the assistance of counsel, but the Court does not find it necessary to appoint counsel in this matter. The benefit to the Court of appointment of counsel would not be substantial as the Court is well aware of the law regarding plaintiff's claim. Plaintiff, although incarcerated, is able to investigate the facts of his claim. The legal issues involved are not legally complex. Considering all the relevant factors, as discussed above, and upon the record to-date, it is hereby ORDERED that plaintiff's motions for legal assistance (Docs. 15 and 27) are denied.

**Summary Judgment Standards**

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Clark v. Kellog Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000); Fed. R. Civ. P. 56(c). To avoid summary judgment, the non-moving party must "show that admissible evidence will be available at trial to establish a genuine issue of material fact." *Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir. 1995). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and by affidavit or otherwise designate specific facts showing that there is a genuine issue for trial." *Commercial Union Ins. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992) (internal quotation marks and citations omitted). "Summary

judgment is an extreme remedy, to be granted only when no genuine issue exists as to any material fact." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997).

While prisoners are entitled to the benefit of liberal construction of their pleadings because of their pro se status, Fed. R. Civ. P. 56 remains applicable to them. *Quam v. Minnehaha County Jail*, 821 F.2d 522 (8th Cir. 1987). Courts must remain sensitive, however, to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and the Eighth Circuit has explicitly disapproved of summary dismissal of prisoner pro se claims without regard for these special problems. *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985). It is with these standards in mind that Plaintiff's case is considered.

### 1. Plaintiff Failed to Exhaust His Administrative Remedies

Because Plaintiff was an inmate at the time his case was filed, the Prison Litigation Reform Act (PRLA) applies to this cause of action. *See* 42 U.S.C. § 1997e; *Doe by and through Doe v. Washington County*, 150 F.3d 920, 924 (8th Cir. 1998). According to 42 U.S.C. § 1997e(a):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The prisoner must exhaust his administrative remedies even if the precise relief he seeks in his § 1983 lawsuit is not available through the prison grievance system. *Booth v. Churner*, 532 U.S. 731, 739, 121 S.Ct. 1819, 1824, 149 L.Ed.2d 958 (2001). Also, although § 1997e(a) refers to "prison conditions," the United States Supreme Court has interpreted that phrase to mean "the PRLA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). To properly exhaust their remedies, prisoners

> complete the administrative review process in accordance with the applicable procedural rules--rules that are defined not by the PRLA, but by the prison grievance process itself. Compliance with the prison grievance procedures, therefore, is all that is required by the PRLA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PRLA, that define the boundaries of proper exhaustion.

*Jones v. Bock*, 127 S.Ct. 910, 922-23, 549 U.S. 199, 218, 166 L.Ed.2d 798 (2007). The Defendants provided a copy of the administrative remedy policy which is applicable at the SDSP. Weber Aff. Doc. 33, Ex A. It includes at least two, and possibly three steps (the third step is an appeal to the Secretary of Corrections, but not all grievances may be appealed to the Secretary). The first step is an informal resolution. The second step is a formal resolution (request for administrative remedy).

The PRLA's exhaustion requirement is an affirmative defense which must be pled and proven by the defense. *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005). Defendants pled Plaintiff's failure to exhaust as an affirmative defense in their Answer. *See* Doc. 21. They provided a copy of the DOC's administrative remedy policy, along with the affidavits of Warden Weber and Clifton Fantroy attaching the administrative remedy requests submitted by Plaintiff. A review of the Weber and Fantroy affidavits reveals Plaintiff submitted a "step one" grievance regarding his cell placement with KI, but did not follow through with the mandatory "step two" grievance according to DOC policy. Plaintiff did not exhaust his administrative remedies. Dismissal of this lawsuit is mandatory on exhaustion grounds alone. *Washington v. Uner*, 273 Fed. Appx. 575 (8th Cir. 2008). Nevertheless, Plaintiff's failure to prove deliberate indifference is very briefly discussed below.

### 2. Plaintiff Has Failed to Prove Deliberate Indifference

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. A prisoner's allegation of inadequate medical attention was recognized as a potentially viable claim for a violation of the prohibition against cruel and unusual punishment, via a § 1983 cause of action, in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To state a cause of action, the prisoner must sufficiently allege "deliberate indifference" to a prisoner's "serious illness or injury." *Id.*, 429 U.S. at 105, 97 S.Ct. at 291. "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id*.

With regard to the "deliberate indifference" requirement, the courts have made clear that mere negligence or medical malpractice is not enough. *Id.*, 497 U.S. at 107, 97 S.Ct. at 293. "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). And, prison officials may also avoid liability if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Liebe v. Norton*,

157 F.3d 574, 577 (8th Cir. 1998) (citation omitted). Also, "repeated negligent acts indicating systemic deficiencies in the method of providing medical care" may amount to deliberate indifference. *DeGidio v. Pung*, 920 F.2d 525, 532 (8th Cir. 1990).

To prevail on a claim of deliberate indifference, a plaintiff must prove: (1) he suffered objectively serious medical needs and; (2) the prison officials actually knew but deliberately disregarded those needs. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). To show deliberate indifference, the plaintiff must show prison officials "knew of, yet disregarded, an *excessive* risk to [his] health." *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir. 1997)(emphasis added, citations omitted). A prisoner's bare assertion or self-diagnosis alone, however, is insufficient to establish the existence of a medical condition. *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994). "When an injury is sophisticated, proof of causation generally must be established by expert testimony. A causal connection between an event and an injury may be inferred in cases in which a visible injury or a sudden onset of an injury occurs. However, when the injury is a sophisticated one, i.e., requiring surgical intervention or other highly scientific technique for diagnosis, proof of causation is not within the realm of lay understanding and must be established through expert testimony." *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002). In this case, Plaintiff has failed to show that his tuberculosis was caused by being celled with KI.

The undisputed medical evidence provided by Dr. Regier indicates Plaintiff did not contract tuberculosis from his cellmate, and could not have contracted tuberculosis from his cellmate. Dr. Regier further explained that all inmates at the SDSP are tested for tuberculosis upon admission. If an inmates tests positive for active tuberculosis, the inmate is isolated from the rest of the prison population. Inmates with latent tuberculosis are not isolated but are medically treated. Dr. Regier opined "there is no danger or threat of exposure of TB by having inmates with latent TB share cells with inmates who do not have TB." Regier Aff. (Doc. 36) ¶ 12. Regier's review of KI's records indicated KI did not have active tuberculosis at the time he was housed with Plaintiff. *Id.* at 11. Given this medical testimony, Plaintiff cannot prove Defendants Weber and Madsen knew of yet disregarded an excessive risk to his health. *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir. 1997)**.** Plaintiff' has produced nothing to contradict Dr. Regier's medical opinion. Plaintiff's bare assertion that the source of his tuberculosis was the cellmate with which he shared a cell for approximately one week is insufficient to sustain an Eighth Amendment claim. For this reason as well, Defendants' Motion for Summary Judgment should be granted.

## CONCLUSION, ORDER AND RECOMMENDATION

For the reasons more fully explained above, it is ORDERED that Plaintiff's Motion for Appointment of Counsel (Doc. 15) is DENIED. It is further respectfully RECOMMENDED to the District Court that Defendants' Motion for Summary Judgment (Doc. 30) be GRANTED.

Dated this 10th day of August, 2010.

BY THE COURT:

s/John E. Simko
_____
John E. Simko
United States District Judge


## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.
*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990)
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986)